Haston v. Castner.

PHILIP HASTON and others, appellants,

v.

MICHAEL CASTNER and others, respondents.

1. Debts being liens, by force of the statute, on the lands of a deceased debtor, a creditor at large, whose claim has been admitted by the executor, has a standing to file a creditor's bill to set aside conveyances alleged to have been made by the deceased in fraud of creditors.

2. *Query*, Whether the executor could take such proceedings.

3. A voluntary conveyance is void by force of the statute relating to frauds and perjuries, with respect to debts existing at the date of such conveyance.

4. If a consideration has been given on such conveyance, the question then is, whether the purpose was fraudulent.

5. In this case, the conveyances—*Held*, valid, on the ground that they were not voluntary, but for a consideration, and no fraud shown.

---

Suit in equity by several creditors of Moore Castner, deceased, against his sons Michael and Nathan Castner, for the purpose of charging two farms, situate in Hunterdon county, which the deceased conveyed to them respectively, with so much of the debts of the complainants as have not been paid by the administrator. It appeared that the estate of Moore Castner was insolvent, and had been settled.

On appeal from a decree of the chancellor, reported in *Haston* v. *Castner, 2 Stew. 536.*

*Mr. J. T. Bird,* for appellants.

*Mr. J. N. Voorhees,* for respondents.

The opinion of the court was delivered by

BEASLEY, C. J.

This is a creditor's bill seeking to charge certain lands with the debts of a deceased grantor, on the ground that the conveyances which he made of such lands to his sons, were in fraud of creditors. As the complainants are simply

creditors at large, not having put their claims in the form of a judgment, the first question to be disposed of is, whether they have any standing in equity that will justify the exhibition of this bill.

It cannot be denied that, in this state, the general rule is entirely settled that, in order to enable a creditor to challenge, on the ground of fraud, a transfer of property made by his debtor, such creditor must have first obtained a judgment or some other lien upon the property. There is quite an array of decisions to this effect, and, upon an examination of these cases, it will be found that the reason given in them why the general creditor is excluded from such a course of relief is, that his debt, until entered of record, is no charge or lien on the property alleged to have been illegally transferred. In *Oakley* v. *Pound, 1 McCart. 178*, the chancellor expressly states this to be the principle on which equity proceeds in this department, and the same ground for equitable action is assigned in the case of *Swayze* v. *Swayze, 1 Stock. 273*. This latter judgment, with respect to the reason on which it rests, being approved of by this court in *Tantum* v. *Green, 6 C. E. Gr. 364*. All the adjudication in this field will be readily found by referring to *1 Stew. Dig. 381, Equity II (g)*.

Under the pressure of these authorities, this bill must give way, unless these claims, or some of them, can be said to constitute liens upon these lands. In the court of chancery, the wide rule, taken from *Loomis* v. *Tifft, 16 Barb. 541*, appears to have been adopted, that if there has been a putting away of lands out of the reach of creditors, that, as equity has jurisdiction in case of frauds, relief will be afforded to this class of creditors, irrespective of the circumstance whether they have a lien on the land or not. But this is plainly a departure from the principle of all the decisions just referred to, in which, in this class of circumstances, the foundation of equitable intervention is expressly based on the existence of the creditor's lien on the property. Nor do I think the modern English cases can be said to lay

down a different rule. None of the cases cited in the court below appear to warrant such a conclusion. *Richardson* v. *Smallwood, 1 Jac. 552*, is a proceeding founded on a judgment, as is, likewise, the *Reese River Silver Mining Co.* v. *Atwell, L. R. (7 Eq.) 346.*

In *Sharp* v. *Soulby, 1 McN. & G. 346*, a bill, in the usual order, was exhibited for the administration of the estate in equity by a creditor at large, and, after a decree to account had been made, and the complainant's claim had been thus accredited, he filed a supplemental bill, in augmentation of the assets, to set aside a fraudulent settlement. The last case cited, *Phelps* v. *Platt, 50 Barb. 430*, is a proceeding having a judgment for a foundation. But whatever may be thought of these cases, as has already been intimated, the rule upon this subject has been too long established in this state to be disturbed, to the effect that, when the pursuit is of legal assets, in contradistinction to equitable assets, there must be a lien on such assets to give a complainant a standing in a court of equity.

But, although I entertain this view, I still think this bill sustainable, and I put that conclusion on the ground that the complainant's claim is a lien on these lands, if his contention that they have been conveyed in fraud of creditors, is assumed to be true. It seems to me, that the statute subjecting the lands of a decedent to his debts, imposes them as a legal burthen upon such lands. By the act (*Rev. p. 766*, § *70*), the lands of "any person who shall die seized thereof, or entitled to the same," shall be and remain liable for the payment of his or her debts for one year after his or her decease, and may be sold by virtue of an order of the orphans court. Although the liability to debts is, in this clause, in terms limited to a year, still it has always been held that, until a *bona fide* sale has been made by the heir or devisee, the lien continues; and this situation is plainly recognized in the seventy-seventh section of the same act, which defines what the effect of the deed given under the order of the orphans court shall be, and which, in that respect, provides that such

conveyance shall vest in the purchaser or purchasers all the estate that the testator or intestate was seized of at the time of his or her death, if the order be obtained within one year thereafter; and, if the said order be not obtained within that time, then the said conveyance shall vest in the purchaser or purchasers, all the estate that the heirs or devisees of the testator or intestate were seized of at the time of the making of the said order of the orphans court; and that this lien upon the lands remains until the heir or devisee has actually conveyed the property, has been judicially declared on several occasions. *Parret* v. *Van Winkle*, cited in *Warrick* v. *Hunt, 6 Hal. 9.*

The act in question, it will be observed, makes debts a burthen on the lands of the decedent of which he " shall die seized;" consequently, when lands are attempted to be conveyed in fraud of creditors, as the statute against frauds and perjuries makes such conveyance absolutely void, such conveyance cannot disturb the seizin of the decedent in such lands, so far as relates to the creditors so injured. With regard to his creditors, the debtor, in contemplation of law, dies seized of the lands, notwithstanding such fraudulent alienation, and, in my judgment, therefore, a creditor, under such circumstances, has his claim fastened upon the land of his debtor, and such lien will give him, within the rule established by the decisions, the footing requisite to maintain himself in a court of equity. It has several times been held that the lien obtained on lands under the attachment act affords such footing, and no reason seems to exist why such statutory right of the creditor in the lands of his deceased debtor, should not have an equivalent effect.

Nor do I think it requisite for the creditor, before seeking his equitable remedy, to obtain a judgment against the administrator. Formerly, under the statutes of this state, such judgment would have bound the lands of the deceased debtor, but such is not now any part of its office, and, therefore, as to this real estate sought to be subjected to these debts, such a proceeding would be wholly inefficacious.

Haston v. Castner.

Neither, in this case, can such a step be called for in order to manifest, in a conclusive form, the fact of the existence of the amount of the debt, for it has been presented, according to the statutory regulation, to the administrator, under oath, and part of it has been paid by him, so that it is as conclusively established, in a legal mode, as though its validity had been passed upon by a court.

With respect to the objection that, in these cases of conveyances by a deceased debtor in fraud of creditors, the remedy should be sought by the administrator, and not by the individual creditor, the answer is two-fold. First, if the capacity of the administrator be admitted, in the present case, the bill shows that he has been applied to, and has virtually refused to proceed, and this would clearly give the complainant a standing to pursue this remedy in his own behalf. It was, in principle, so held in the case of the *President, Managers &c.* v. *Trenton City Bridge, 2 Beas. 46,* as will appear by an examination of the bill. But, in the second place, it is obvious that, in many cases, perhaps in most, there would be serious difficulties in the way of a procedure of this nature being instituted in the name of the personal representative, because conveyances of this character depend very often for their effect on the relations of the debtor towards particular creditors, so that, while they may be void as to some of such creditors, they may be valid as to others. Suggesting, therefore, these embarrassments, but without concluding that the personal representative may not take proceedings of this kind, after having obtained, in the orphans court, an order for the sale of the lands of the debtor, it is sufficient now to say that it is a convenient practice, and is not open to legal objection, for the individual creditor, for his own benefit, and in behalf of others similarly situated, to institute these suits. Consequently, I think the bill should be retained, and the case decided upon its merits.

Connected with these events, there is a principle of law which it is of some importance should be carefully settled

by this court.   I refer to the rule with respect to the effect
of a voluntary conveyance on existing debts.   To the princi-
ple adopted in this case in the court below, I cannot sub-
scribe.   That principle is this :   Speaking of these deeds in
controversy, made by Moore Castner, the chancellor says :
" If he had available assets sufficient to answer all his pecun-
iary obligations, over and above the property conveyed to
them, the conveyances are valid against their existing cred-
itors, even though the conveyances were wholly voluntary."
Now, I am constrained to dissent altogether from that doc-
trine, for the rule that a voluntary conveyance can be
avoided by creditors whose debts exist at the date of such
conveyance, and that, too, without reference to the pecun-
iary condition of the debtor, is a doctrine having such a
weight of adjudication in this state, in its favor, that it
seems to me that it ought to be considered as definitively
settled.   So far as my experience extends, it has always
been so ruled in trials at the circuits.   Nor is the principle
of recent origin in our courts, for it was recognized in
judgment, and put in force, as long ago as the time of
Chief-Justice Kinsey.   The first mention of the subject in
our reports, is to be found in the case of *Den* v. *De Hart*,
decided in the year 1798, and reported in *1 Hal. 450*.   That
case presented an instance of a voluntary conveyance from
a father to his children, made upon no other consideration
than natural affection, and the question was whether such
deed was good under the statute against frauds and perju-
ries, with respect to a person having a cause of action
against such father at the date of the conveyance.   At the
trial it was left to the jury to say if the transaction was fair
and *bona fide*, or whether its object was fraudulent to pre-
vent those who had claims against the grantor from obtain-
ing justice ; but the jury having found against the honesty
of the affair, on a motion for a new trial, Chief-Justice
Kinsey cited, with approbation, the remarks of Lord Hard-
wicke, in the two leading cases of *Russell* v. *Hammond, 1
Atk. 13*, and *Townsend* v. *Windham, 2 Ves. 10*, and quotes

Haston v. Castner.

from the latter of these cases the following sentences:
" There is *no case* where a person indebted makes a volun-
tary conveyance of a real or chattel interest for the benefit
of a child, without the consideration of marriage or other
valuable consideration, and dying afterwards indebted, that
that shall take place."  " I know no case on the *13 Elizabeth*,
when a man indebted at the time makes a mere voluntary
conveyance to a child, without consideration, and dies
indebted, but that it shall be considered as part of his
estate, for the benefit of his creditors."    The chief-justice
then says that those cases fully establish the point that a
voluntary deed made when the grantor is indebted, is
invalid against *such creditors*, and that this doctrine is recog-
nized by numerous authorities, sanctioned by the ablest
judges, and questioned by none.

A short time after this decision, in the year 1798, at a
trial at *Nisi Prius*, in the case of *Den* v. *Lippincott*, reported
also in *1 Hal. 473*, the principle thus announced and vindi-
cated was practically enforced by the same learned judge.
Then, after another interval of about twenty years, the
same question arose in the court of chancery of New York,
in the case of *Reade* v. *Livingston, 3 Johns. Ch. 481*, leading
to the production, by Chancellor Kent, of his celebrated
opinion, which comprises all the learning on the subject
then extant, and which has had so much to do with the
shaping of judicial opinion on this topic in this country.
After a thorough review of all the cases, the chancellor
comes to this result:    He says:  " The conclusion to be
drawn from the cases is, that if the party be indebted at
the time of the voluntary settlement, it is presumed to be
fraudulent in respect to such debts, and no circumstance
will permit those debts to be affected by the settlement, or
repel the legal presumption of fraud.    The presumption of
law in this case does not depend upon the amount of the
debts, or the extent of the property in settlement, or the
circumstances of the party.    There is no such line of dis-
tinction set up or traced in any of the cases.    The attempt

would be embarrassing, if not dangerous, to the rights of the creditor, and prove an inlet to fraud. The law has, therefore, wisely disabled the debtor from making any voluntary settlement of his estate to stand in the way of his existing debts."

From this citation it will be observed that the case of *Reade* v. *Livingston,* and the cases decided by Chief-Justice Kinsey, are in exact agreement, and enunciate precisely the same legal principle. And the same rule has since received judicial sanction in our own courts. In *Satterthwaite* v. *Embly,* *3 Gr. Ch. 489,* a voluntary settlement made by a husband, after marriage, in favor of his wife, was declared void as against the creditors of the husband, whose debts were in existence at the date of such deed. And nowhere do we find the existence of this rule more directly approved of than it was in the case of *Cook* v. *Johnston,* *1 Beas. 51,* by Chancellor Williamson, for he says: "Although there is some conflict of authority, I think the principle is correctly laid down by Chancellor Kent, in *Reade* v. *Livingston,* that if the party is indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts (that is, those antecedently due), and no circumstance will permit those debts to be affected by the settlement, and repel the legal presumption of fraud." In *Beeckman* v. *Montgomery,* *1 McCart. 106,* Chancellor Green has left upon record his approval of the same doctrine.

This train of authorities, extending over so large a part of our judicial records, should have the effect, as it seems to me, of completely settling the rule of law in this state. These cases do not appear to have been within the attention of the chancellor when he adopted the opposite principle as his rule of judgment; but, as that rule of decision was in direct opposition to these adjudications, it became necessary in this court to restate the correct doctrine on the subject. It may be well, also, to remark that, by consulting *1 Am. Lead. Cas.,* under the title of Voluntary Conveyance, it will abundantly appear that the doctrine so elaborately vin-

dicated in *Reade* v. *Livingston*, has been accepted very generally by the courts of this country, and that, with this view, the well-considered opinion of Lord Westbury, in the late case of *Spirett* v. *Willows, 3 DeG. J. & S. 302,* is in all respects conformable.

The result is that, entertaining these views, it does not seem to me that the present case can be disposed of by means of the rule adopted in the court below; but, notwithstanding this conviction, I have not, upon the merits, been led to a result in anywise different from that to which the chancellor arrived. The considerations so prevailing with me, are these: The conveyances from Moore Castner to his sons were not gratuities, not voluntary transfers of property, but a consideration was paid for them. This fact I regard as being satisfactorily substantiated, and, this being so, the transaction, in a legal point of view, has no affinity to the doctrine just discussed. When the conveyance is not voluntary, but is upon a consideration, then the rule is, that, in order to overthrow it, a fraudulent intent must be made to appear, just as it must be when the debts sought to be enforced have been contracted subsequently to the conveyance; and it seems to me that, in the present instance, so far from an intended fraud being made to appear by the proofs, such an idea is utterly exploded by the admitted circumstances. This affair was not transacted in the dark, but in open daylight; the deeds were drawn by a scrivener of the neighborhood; the father, on several occasions, spoke to his neighbors about the matter, and directed the taxes to be assessed to his sons; the deeds were recorded, and the sons lived upon their respective properties, improving them and repairing the buildings; the father, at the time of the conveyance, was not insolvent, but had ample means for the payment of his debts, and was, therefore, under no influence leading him to put the property out of his hands for any illegal purpose, and the circumstance that the farms were put to his children at a considerable under-valuation, was, under the circumstances, not unnatural, and cannot be

a fact of much importance in a transaction attended with so many indications of an honest purpose. On the ground, therefore, that these conveyances were made on a valuable consideration, and that no fraud has been shown, I think the transaction should be allowed to stand, and shall accord-cordingly vote to affirm this decree.

Decree unanimously affirmed.